**Mary Nell WYATT et al., Plaintiffs,**

v.

**SYRIAN ARAB REPUBLIC et al., Defendants.**

**Civil Action No. 01–1628 (RMU).**

United States District Court, District of Columbia.

March 3, 2005.

---

See, also, 225 F.R.D. 1.

David Jacob Strachman, McIntyre, Tate, Lynch & Holt, Providence, RI, for Plaintiffs.

Abdeen M. Jabara, New York City, Maher Hanna Hanania, Hanania Kheder & Nawash, Falls Church, VA, *for* Defendants.

## *MEMORANDUM OPINION*

URBINA, District Judge.

DENYING SYRIA'S MOTION TO DISMISS; ORDERING THE PARTIES TO SUBMIT A JOINT JURISDICTIONAL DISCOVERY PLAN; GRANTING THE PLAINTIFFS LEAVE TO AMEND THEIR COMPLAINT WITH A MORE SPECIFIC STATEMENT OF THE LAW ON WHICH THEY WILL BASE THEIR CAUSES OF ACTION

### I. INTRODUCTION

This case involves the defendant's alleged support of a terrorist group (the Kurdistan Workers Party or "PKK") that abducted and held certain of the plaintiffs hostage in the early 1990s. The plaintiffs seek damages from the Syrian Arab Republic ("Syria" or the "defendant") and the PKK for injuries resulting from the alleged hostage taking. Syria now moves to dismiss, claiming that the court lacks personal and subject-matter jurisdiction and that the plaintiffs fail to state a claim. For the reasons that follow, the court denies Syria's motion to dismiss on personal jurisdiction grounds; denies without prejudice Syria's motion to dismiss on subject-matter jurisdiction grounds; orders the parties to submit a plan for conducting discovery on Syria's alleged support of the PKK; denies without prejudice Syria's motion to dismiss for failure to state a claim; and grants the plaintiffs leave to amend their complaint to include a more specific statement of the law on which they will base their causes of action.

### II. BACKGROUND

#### A. Factual Background

The plaintiffs allege as follows. On August 30, 1991, several of the plaintiffs (Ronald E. Wyatt and Marvin T. Wilson) were traveling in a van in Turkey when they "were stopped and surrounded by approximately ten vehicles commanded by the PKK." 2d Am. Compl. ("Compl.") ¶ 20. The PKK entered the van, removed the plaintiffs at gunpoint, and eventually held Wyatt and Wilson for twenty-one days in eastern Turkey. *Id.* ¶¶ 21–22. The PKK forced Wyatt and Wilson to

> march for up to eleven hours at a time and made [them] live outdoors exposed to the elements without food, shelter, or clothing ... denied [Wyatt and Wilson] medical care, the ability to communicate with their families or the outside world, subjected [them] to indoctrination and brainwashing attempts and ... otherwise mistreated [them].

*Id.* ¶ 22.

The PKK and Syria "intended" the hostage-taking to (a) harm Turkish tourism;

(b) embarrass the Turkish government; and (c) "utilize Wyatt and Wilson (and the other non-party hostages) as human bait to lure Turkish rescue personnel into ambushes in order to kill them." *Id.* ¶ 23. The PKK placed certain demands and conditions on the release of Wyatt and Wilson; the PKK made these demands and conditions to "outside parties," including governments of the United States, Britain, Australia, and Turkey. *Id.* ¶ 23. In particular, the PKK demanded that: (a) the United States terminate its financial and military support of Turkey; (b) the United States, Britain, Australia and Turkey support an independent Kurdish state; (c) the international community recognize the PKK's right to control portions of Turkish territory; and (d) the Turkish government provide increased civil rights to Kurds. *Id.*

The plaintiffs further allege that

[a]t all times relevant to this complaint and for at least a decade prior to the abduction of plaintiffs, Syria routinely provided financial, technical, logistical and other material support and resources to the PKK for the express purpose of causing and facilitating the commission of terrorist acts, including acts of extrajudicial killing and hostage-taking.

*Id.* ¶ 28. As examples of this support, the plaintiffs cite Syria's (a) assistance and participation in hostage-taking (including the hostage-taking of Wyatt and Wilson); (b) supply of weapons, ammunition, and false passports to the PKK; (c) establishment and maintenance of the PKK headquarters and offices in Syria; (d) provision of a safe haven and shelter in Syria to senior PKK commanders; (e) establishment and maintenance of various PKK training and military bases; (f) provision of military and terrorist training to PKK members; and (g) establishment and

maintenance of PKK's logistical infrastructure in Syria. *Id.* ¶ 29.

## B. Procedural History

The plaintiffs filed their initial complaint in July 2001 and an amended complaint in March 2003. In February 2004, in light of *Cicippio–Puleo v. Islamic Republic of Iran,* 353 F.3d 1024 (D.C.Cir.2004), this court *sua sponte* granted the plaintiffs leave to amend their complaint "to clarify the jurisdictional basis for suit, the defendants and the capacity in which each defendant is sued, the cause of action for each claim, the relief requested for each claim, and any other matters affected by the intervening precedent." Mem. Op. (Feb. 23, 2004) at 1–2. The plaintiffs filed their second amended complaint on March 18, 2004. In that complaint, the plaintiffs listed as defendants the Syrian Arab Republic, the Syrian Ministry of Defense, Mustafa Tlass (the Syrian Minister of Defense), Ghazi Kanaan (a Syrian military officer), and the PKK. Compl. ¶¶ 15–19.

The defendants (with the exception of the PKK) filed their motion to dismiss in May 2004. Believing that Syria's motion attacked the factual basis of the court's subject-matter jurisdiction, in September 2004 the plaintiffs moved to compel jurisdictional discovery. The court granted the plaintiffs' motion in November 2004 and ordered the parties to submit a joint jurisdictional discovery plan. Syria moved for reconsideration several days later, arguing that the court should avoid discovery because the complaint could be dismissed on grounds that would not subject a foreign sovereign to burdensome discovery. On December 14, 2004, the court granted Syria's motion for reconsideration, holding that the most appropriate course of action would be for the parties to complete the chain of briefing on Syria's motion to dismiss prior to any discovery. Accordingly,

the parties never submitted a discovery plan.

On January 26, 2005, the plaintiffs filed a notice of voluntary dismissal of their claims against the Syrian Ministry of Defense, Mustafa Tlass, and Ghazi Kanaan. Pls.' Notice of Dismissal at 1. Thus, the only defendants remaining in this case are Syria and the PKK. Finally, on February 15, 2005, the plaintiffs (irked by what the plaintiffs label as Syria's "maneuver of breathtakingly blatant bad-faith," "bait-and-switch" tactics, and a "frivolous and pointless claim") submitted a motion to strike certain sections of Syria's reply to the plaintiffs' opposition to Syria's motion to dismiss. Pls.' Mot. to Strike at 2. Rather than wait for the chain of briefing to come to a close on this latest submission, the court moves forward, mindful of the arguments in the plaintiffs' motion, expecting that the parties will work together in a more collegial manner, and quite confident that the court will craft an appropriate response to the mischief or other inappropriate behavior which may surface as this case proceeds.

## III.  ANALYSIS

### A.  The Court Denies Syria's Motion to Dismiss for Lack of Subject–Matter Jurisdiction

#### 1.  Legal Standard for a Rule 12(b)(1) Motion to Dismiss Under the FSIA

■ The Foreign Sovereign Immunities Act ("FSIA") is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The basic premise of the FSIA is that foreign sovereigns are immune from suit in the United States unless the action falls under one of the specific exceptions enu-merated in the statute. 28 U.S.C. § 1604; *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 196 (D.C.Cir.2004) ("*Price II*"). If the foreign sovereign is not immune, the federal district courts have exclusive jurisdiction over the action. 28 U.S.C. §§ 1330, 1604; *Daliberti v. Republic of Iraq*, 97 F.Supp.2d 38, 42 (D.D.C.2000) (citing *Amerada Hess*, 488 U.S. at 434–35, 109 S.Ct. 683).

■ Under the FSIA, the foreign sovereign has "immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C.Cir.2000) (quoting *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C.Cir.1990)). The special circumstances of a foreign sovereign require the court to engage in more than the usual pretrial factual and legal determinations. *Foremost–McKesson*, 905 F.2d at 449. The D.C. Circuit has noted that it is particularly important that the court "satisfy itself of its authority to hear the case" before trial. *Id.* (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C.Cir.1984)).

■ Once a foreign-sovereign defendant asserts immunity, the plaintiff bears the burden of producing evidence to show that there is no immunity and that the court therefore has jurisdiction over the plaintiff's claims. *Daliberti*, 97 F.Supp.2d at 42 (citations omitted). A court may dismiss a complaint brought under the FSIA only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Id.* (citations omitted). Once the plaintiff has shown that the foreign defendant is not immune from suit, the defendant bears the burden of proving that the plaintiff's allegations do not bring the case within one of the statutory exceptions to immunity. *Phoenix Consulting*, 216 F.3d at 40.

The exception to foreign sovereign immunity at issue in this case is the state-sponsored terrorism exception, codified at 28 U.S.C. § 1605(a)(7), that Congress enacted as part of the comprehensive Anti-terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, § 221(a), 110 Stat. 1214 (Apr. 24, 1996), which provides that foreign sovereigns are not immune when

> [m]oney damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency[.]

28 U.S.C. § 1605(a)(7). The statute gives three additional requirements for the exception to apply: (1) the foreign state must be designated as a state sponsor of terrorism at the time the act occurred or was designated as such as a result of such an act; (2) the plaintiff must afford the foreign state a reasonable opportunity to arbitrate the dispute if the act occurred within that state's territory; and (3) either the claimant or the victim must have been a United States national at the time the act occurred. 28 U.S.C. § 1605(a)(7)(A)-(B).

On a Rule 12(b)(1) motion to dismiss in an FSIA case, the defendant may challenge either the legal sufficiency or the factual underpinning of an exception. *Phoenix Consulting*, 216 F.3d at 40. Given that a foreign-state actor's entitlement to immunity from suit is a critical preliminary determination, the parties have the responsibility, and must be afforded a fair opportunity, to define issues of fact and law, and to submit evidence necessary to the resolution of the issues. *Foremost–McKesson*, 905 F.2d at 449 (*citing Gould, Inc. v. Pechiney Ugine Kuhlmann & Trefimetaux*, 853 F.2d 445, 451 (6th Cir. 1988)). Thus, the court must resolve the substantive immunity-law issues of section 1605 before reaching a decision on subject-matter jurisdiction. *Id.* (citations omitted).

■ If the defendant challenges the legal sufficiency of the plaintiff's jurisdictional allegations, the court should accept the plaintiff's factual allegations as true and determine whether such facts bring the case within any of the exceptions to foreign-state immunity invoked by the plaintiff. *Id.* This standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C.Cir. 2002) ("*Price I*"). The plaintiff need not set out all of the precise facts on which he bases his claim to survive a motion to dismiss. *Id.*

■ If the defendant challenges the factual basis of the court's jurisdiction, however, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff. *Phoenix Consulting*, 216 F.3d at 40. Instead, the court must resolve any disputed issues of fact, the resolution of which is necessary to a ruling upon the motion to dismiss. *Id.*; *Price I*, 294 F.3d at 90; *Foremost–McKesson*, 905 F.2d at 449. The court has "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," but it must give the plaintiff "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Phoenix Consulting*, 216 F.3d at 40 (quoting *Prakash*, 727 F.2d at 1179–80). To avoid burdening a

foreign sovereign that proves to be immune from suit, however, the court should carefully control and limit jurisdictional discovery. *Id.; Foremost–McKesson*, 905 F.2d at 449.

## 2. The Plaintiffs' Do Not Base Their Claims of Hostage Taking and Extrajudicial Killing on the Acts of an Official, Employee, or Agent of Syria

■ The defendant argues that 28 U.S.C. § 1605(a)(7) does not apply to this case and that Syria therefore retains sovereign immunity. Def.'s Mot. to Dismiss ("Def.'s Mot.") at 10. Specifically, the defendant argues that the plaintiffs fail to allege hostage taking, extrajudicial killing, or the provision of material support and resources for such acts. *Id.* at 10–16. Before getting to these arguments, however, the court must resolve an issue that has not quite made an explicit appearance in either side's briefing, but the jurisdictional nature of which cannot escape discussion. As indicated, the plaintiffs attempt to invoke this court's jurisdiction by alleging hostage taking, extrajudicial killing and the material support for such acts. Although the parties dispute each of these allegations, the parties do not address *who*, as far as 28 U.S.C. § 1605(a)(7) is concerned, must conduct the hostage taking or killing.

The plaintiffs do not claim that Syria directly conducted the alleged acts or that the PKK is an agent of Syria. Rather, the issue is Syria's provision of support and resources to the PKK. As § 1605(a)(7) makes clear, however, "an official, employee, or agent of [the] foreign state" must commit the alleged torture, extrajudicial killing, provision of resources, etc. "while acting within the scope of his or her office, employment, or agency[.]" 28 U.S.C. § 1605(a)(7); *Kilburn v. Socialist People's*

*Libyan Arab Jamahiriya*, 376 F.3d 1123, 1129 (D.C.Cir.2004) (stating that foreign states lose immunity for acts of torture, extrajudicial killing, or hostage taking "*engaged in by an official, employee, or agent' of the state itself*") (quoting 28 U.S.C. § 1605(a)(7)) (emphasis added). Because the plaintiffs do not claim that an official or employee of Syria committed terrorist acts or that the PKK is an "agent" of Syria, but only that Syria provided support to a group that committed terrorist acts, the court cannot base its subject-matter jurisdiction on hostage taking or killing. *Kilburn*, 376 F.3d at 1130–31 (differentiating theories of material support and theories of agency). Accordingly, the plaintiffs' only basis for subject-matter jurisdiction over the defendant is a successful demonstration that the defendant provided "material support or resources" to the PKK for such acts. *Cf. id.* (referring to Libyan *agents* in Lebanon who Libya *funded and directed* to purchase an American hostage so that Libya could kill him).

## 3. For a Nation to Lose Immunity for Providing Material Support and Resources for a Terrorist Act, at Least One of the Terrorist Acts Enumerated in § 1605(a)(7) Must Occur

Another preliminary matter arises with regard to the provision of material support or resources. The plaintiffs argue that the court has jurisdiction pursuant to § 1605(a)(7) regardless of whether the provision of material support leads to hostage taking or extrajudicial killing. Pls.' Opp'n at 16 (stating that if the plaintiffs demonstrate that "they were harmed as a result of defendants' provision of material support and resources to the PKK, defendants will be liable *irrespective of whether the abduction itself constitutes an act of hostage taking or extrajudicial killing*") (emphasis added). The defendant maintains

that "[t]he occurrence of at least one of the acts enumerated in § 1605(a)(7) is an element necessary for the section's application." Def.'s Mot at 16 (citing *Kilburn v. Republic of Iran*, 277 F.Supp.2d 24, 32 (D.D.C.2003)). The court agrees with the defendant.

■ Subject matter jurisdiction arises pursuant to the provision of material support and resources component of § 1605(a)(7) only when the defendant provides such support for an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking *and* one of those acts occurs.[1] The text of § 1605(a)(7), although not precise, directs this result: the statute waives immunity when a plaintiff seeks damages "for personal injury or death that was caused by an *act* of torture, extrajudicial killing, aircraft sabotage, hostage taking, *or the provision of material support or resources ... for such an act* [.]" 28 U.S.C. § 1605(a)(7) (emphasis added). Under the plaintiffs' reading, however, a nation could provide material support and resources to a group of terrorists for the purpose of hostage taking, the group could then use that support for an unrelated purpose (for example, to build a cafeteria), and a plaintiff could bring suit for injury proximately caused by that support (for example, a slip and fall in the cafeteria). Although Congress no doubt sought in § 1605(a)(7) to address the fungibility of money, the court rejects the plaintiffs' broad reading of § 1605(a)(7). *See* H.R.Rep. No. 104–383, at 62 (1995) (noting

that a lawsuit pursuant to § 1605(a)(7) "must allege that the terrorist act *was undertaken* ") (emphasis added).

### 4. The Plaintiffs' Claim of Extrajudicial Killing Fails

■ Section 1605(e)(1) adopts the definition of extrajudicial killing contained in the Torture Victim Protection Act of 1991: "the term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 note. The plaintiffs allege that "[d]uring the course of the PKK operation in which Wyatt and Wilson were abducted and held hostage, the PKK murdered at least two Turkish security personnel who were attempting to rescue the hostages." Compl. ¶ 35. These murders, the plaintiffs argue, constitute acts of extrajudicial killing (for which Syria provided material support and resources) within the meaning of 28 U.S.C. § 1605(a)(7). *Id.* Syria responds that "the deaths of soldiers presumably unknown and unrelated" to the plaintiffs cannot provide a ground for removing sovereign immunity. Def.'s Mot. at 14 (noting that "[n]o sufficient causal connection is alleged or could be alleged between personal injury to [the plaintiffs] for which plaintiffs might sustain and claim damages

---

1. A nation loses immunity even if the support it provides does not directly fund the particular terrorist act that injured or killed the victim. *Kilburn*, 376 F.3d at 1130 (noting that money is fungible and "terrorists organizations can hardly be counted on to keep careful bookkeeping records"). The only requirement is that the provision of support proximately causes the terrorist act. *Id.* Presumably, then, a nation could lose immunity by providing support to a terrorist group for

general torture purposes when the group instead decides to take a hostage or sabotage an aircraft. *Id.* Congress, it seems, recognized that a court's main concern should be a nation's general funding of terrorist activities (those activities listed in § 1605(a)(7)), not determining whether a rogue nation's henchman misallocates the hostage taking funds for acts of torture, extrajudicial killing, or aircraft sabotage. *Id.* at 1129 (citing H.R.Rep. No. 104–383, at 62 (1995)).

and the deaths of the Turkish soldiers as alleged").

The deaths of two Turkish soldiers are events separate from the events that caused the injuries the plaintiffs allegedly suffered. Nevertheless, the plaintiffs attempt to lump together their own injuries and the death of the soldiers into an overall terrorist operation of extrajudicial killing—as if to say, but for the hostage taking, the deaths of the Turkish soldiers would not have occurred. Pls.' Opp'n at 11 (claiming that "[b]ecause the terrorist operation in which plaintiffs were abducted was intended to and did in fact cause the extrajudicial killing of the Turkish rescue personnel, that operation as a whole constitutes 'an act of . . . extrajudicial killing' ") (quoting 28 U.S.C. § 1605(a)(7)). The plaintiffs try to support their argument with this court's decision in *Campuzano v. Islamic Republic of Iran,* which held that a Hamas bombing that injured the plaintiffs was an act of extrajudicial killing. 281 F.Supp.2d 258, 269–70 (D.D.C. 2003). But in that case, the extrajudicial killing injured the plaintiffs, *id.;* here, the death of Turkish soldiers caused no injury to the plaintiffs, other than perhaps diminishing their hopes of a rescue. Because the plaintiffs' theory thus takes § 1605(a)(7) well beyond its express purpose of compensating American nationals for terrorist acts, and because the plaintiffs provide no case law that supports their position, the court rejects the plaintiffs' claim of extrajudicial killing.

**5. The PKK Committed Hostage Taking Within the Meaning of 28 U.S.C. § 1605(a)(7), but the Parties Dispute Whether Syria Provided Material Support and Resources to the PKK to Facilitate Hostage Taking**

■ As indicated above, because Syria or its agent did not commit an act of hostage taking, the plaintiff must show

that Syria provided material support to the PKK to commit that act. The court therefore faces two separate issues: whether Syria provided such support, and whether the PKK committed hostage taking. The court addresses the latter issue first.

**a. The PKK Committed Hostage Taking Within the Meaning of 28 U.S.C. § 1605(a)(7)**

The FSIA defines "hostage taking" according to how that term is used in Article 1 of the International Convention Against the Taking of Hostages ("ICATH"). 28 U.S.C. § 1605(e)(2). As the D.C. Circuit stated in *Simpson:*

> "Hostage taking" occurs under the ICATH (and so under the FSIA) when a person "seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of a hostage." Article I, ICATH, U.N. GAOR, Supp. No. 39, U.N. Doc. A/34/39 (1979). The essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the convention.

*Simpson,* 326 F.3d at 234–35; *Price I,* 294 F.3d at 94 (holding that a complaint failed to state hostage taking where the complaint pointed "to no nexus between what happened to [the plaintiffs] in Libya and any concrete concession that Libya may have hoped to extract from the outside world").

The plaintiffs allege that the PKK placed certain demands and conditions on the release of Wyatt and Wilson—specifically, that (a) the United States terminate its financial and military support of Turkey; (b) the United States, Britain, Australia and Turkey support an independent

Kurdish state; (c) the international community recognize the PKK's right to control portions of Turkish territory; (d) the Turkish government provide increased civil rights to Kurds. Compl. ¶ 23. The defendant responds that "political, national and ethnic aspirations of the PKK are incapable of serving as the kind of a condition of release required by *Price* [.]" Def.'s Mot at 12. The defendant also claims that seizing tourists was a "continuing activity" that did not have a *quid pro quo* demand as an implicit or explicit condition of release. *Id.* at 13.

The PKK's demands and conditions on the release of Wyatt and Wilson satisfy the definition of hostage taking in § 1605(a)(7). The defendant protests that lofty aspirations cannot constitute a condition of release. Def.'s Reply at 4 (arguing that "achievement of these objectives cannot be readily ascertained and it would be difficult to determine whether or not the conditions have been met"). At some point, the defendant's argument might be valid—an act of hostage taking to compel a god to destroy America presumably would go beyond any reasonable understanding of intending to accomplish third-party compulsion, if a god could be considered a "third-party." *Cf. United States v. Lin,* 101 F.3d 760, 766 (D.C.Cir.1996) (holding that the domestic statute that implements the International Convention Against the Taking of Hostages does not "differentiate between the various motivations that might prompt a person to take hostages in order to compel action by a third person"). But unrealistically trying to force nations to abstain from providing assistance to disliked causes or seeking international recognition of one's own cause is *de rigueur* with terrorists. *E.g., United States v. Hammoud,* 381 F.3d 316, 325 (4th Cir. 2004) (discussing Hizballah's goal of destroying Israel). Nothing in the text of § 1605(a)(7), the definition of hostage taking to which it refers, or the case law thereon requires immediately achievable concessions. *But see* Def.'s Reply (requiring "quickly and decisively achieved" objectives). On the contrary, the case law speaks of the hostage taker's hope and intent. *Price I,* 294 F.3d at 94–95.[2]

Moreover, the court is reluctant to follow the defendant's lead and analyze the likelihood of a Kurdish state or a reduction in American support of Turkey, an academic task better suited to political scientists. Instead, the court looks for "any concrete concession" that the PKK "may have hoped to extract from the outside world." *Id.* Termination of financial and military support of Turkey, increased support of Kurdish causes and, ultimately, the creation of a Kurdish state strike the court as these types of concrete concessions. *Cf. id.* (holding that "detention for the goal of expressing support for illegal behavior" does not constitute the taking of hostages).

---

**2.** In this regard, the court does not find persuasive Syria's attempt to draw attention to a factual dispute about whether the hostages eventually escaped or were released. *E.g.,* Reply at 5. The PKK could have taken hostages with the intent to compel third party action as a condition of release and, after a period of time, released the hostages for any number of reasons (for example, after a determination that the hostages would not help the PKK achieve its goals). There is no indication in the International Convention Against the Taking of Hostages that such a scenario would not still qualify as hostage taking—indeed, the Convention and the caselaw appear far more focused on the intent of the hostage taker at the time of the initial taking of the hostage. *See* Article I, ICATH, U.N. GAOR, Supp. No. 39, U.N. Doc. A/34/39 (1979); *Simpson II,* 326 F.3d at 234–35 (holding that "[t]he essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the convention").

Accordingly, the PKK's demands and conditions on the release of Wyatt and Wilson satisfy the definition of hostage taking in § 1605(a)(7).

### b. Syria's Alleged Provision of Material Support and Resources to the PKK

■ Having determined that the PKK committed an act of hostage taking (sufficient to overcome a Rule 12(b)(1) motion to dismiss), the court proceeds to determine whether Syria provided material support and resources to the PKK for that act. As indicated above, the plaintiffs allege that

> [a]t all times relevant to this complaint and for at least a decade prior to the abduction of plaintiffs, Syria routinely provided financial, technical, logistical and other material support and resources to the PKK for the express purpose of causing and facilitating the commission of terrorist acts, including acts of extrajudicial killing and hostage-taking.

Compl. ¶ 28; *see also id.* ¶ 29 (listing examples of this support). At a previous stage of this case when Syria opposed jurisdictional discovery, the court determined that the dispute between the parties regarding Syria's support of the PKK constituted a challenge to the factual basis of the court's jurisdiction. As the court stated,

> [t]he plaintiffs argue that a section of the defendants' motion to dismiss concerning due process presents a challenge to the factual basis of the court's jurisdiction. That section states that a State Department assessment of global terrorism "casts serious doubt on the accuracy of the extravagant claim in the complaint of support furnished to the PKK by Syria in 1991 and reinforces the complaint's fatal deficiency in failing to allege or show any connection between the support that was allegedly furnished by

Syria to the PKK and the events in 1991 that are the subject of this action."

*Wyatt v. Syrian Arab Republic,* 225 F.R.D. 1, 3–4 (D.D.C.2004) (citations omitted). Although the court noted the defendant's argument that its discussion was in the context of personal jurisdiction, the court went on to indicate that

> the defendants also maintain that "the complaint's allegations of support are so extreme and exaggerated as to be implausible on their face and as a matter of common sense." In other words, the defendants believe that the plaintiffs' allegations are so factually deficient as to move the allegations beyond the realm of factual dispute and into implausibility. Although the defendants make clear they have other arguments for dismissing the plaintiffs' complaint, they leave no doubt that the court will be returning to the issue of material support. Because material support will remain an issue, and because the plaintiffs have made at least a colorable claim that the defendants provided this support, the court will not allow the defendants to escape discovery simply by claiming that a disputed fact is so disputed that it is no longer really a fact at all.

*Id.* (citations omitted).

■ Although this court initially granted the plaintiffs' motion to compel discovery, on reconsideration the court held that the parties should complete the briefing on the defendant's motion to dismiss to determine if there were a way of resolving the case short of subjecting a foreign sovereign to discovery. Having now determined (after the benefit of full briefing on the motion to dismiss) that an act of hostage taking did indeed occur for jurisdictional purposes, the court arrives at the same place it did on November 2, 2004: the need for jurisdictional discovery on the issue of Syria's alleged provision of materi-

al support and resources to the PKK.[3] Before ordering the parties to submit a plan regarding how that discovery should proceed, however, the court takes a moment to reject Syria's remaining arguments for dismissing the complaint.

## B. The Court Rejects Syria's Due Process Arguments [4]

■ Syria argues that jurisdiction in this court would violate Syria's due process rights because Syria lacks minimum contacts with the United States and is unable to challenge the Executive Branch's designation of Syria as a terrorist state. Defs.' Mot. at 7. The court need not linger long on these arguments, for as the defendant concedes, binding law in this circuit is not in its favor. *Id.* at 8 (citing *Price I*, 294 F.3d at 99). Indeed, as the court stated in *Price I*, "the Constitution imposes no limitation on the exercise of personal jurisdiction by the federal courts over [foreign sovereigns.]" 294 F.3d at 86.

■ In addition to their due process claims under American law, the defendant generally claims that this court's exercise of jurisdiction over Syria "is unreasonable and impermissible under applicable principles of international law." Def.'s Mot. at 9 (citing RESTATEMENT (THIRD) FOREIGN RELATIONS LAW OF THE UNITED STATES (1986) at § 403). In *Flatow v. Islamic Republic of Iran,* a case involving Iran's provision of material support to a terrorist group that engaged in homicide bombings, Iran raised a similar argument. 999 F.Supp. 1, 15 n. 7 (D.D.C. 1998). The court in that case limited its analysis to a determination that Congress intended extraterritorial application of § 1605(a)(7), but also noted that jurisdiction over Iran would be consistent with international law. *Id.* As the court stated, "extraterritorial application of the state sponsored terrorism exceptions is consistent with international law; three of the five bases for the exercise of extraterritorial jurisdiction are implicated in actions by United States victims of foreign state sponsored terrorism: passive personality (nationality of victim), protective (national security interests), and universal (subject to jurisdiction wherever the offender may be found)." *Id.* (citing RESTATEMENT (THIRD) FOREIGN RELATIONS LAW OF THE UNITED STATES (1986) at

3. Syria also disputes whether the PKK communicated its conditions for the release of the plaintiffs to any third parties. *E.g.,* Reply at 3 (stating that "[t]here is no sufficient allegation in the complaint that the PKK communicated [its] 'conditions' to any government or government officials or any other third party as prerequisites for the release"). As indicated above, however, the plaintiffs allege that the PKK placed certain demands and conditions on the release of Wyatt and Wilson to "outside parties," including governments of the United States, Britain, Australia, and Turkey. *Id.* ¶ 23. Moreover, *Simpson II* and other cases make clear that the hostage takers need not communicate with the outside world with a high degree of clarity and precision. *Simpson II,* 326 F.3d at 234 (noting that the sought-after third party action can be an "an explicit *or* implicit condition for the release of a hostage") (emphasis added); *see also Price*

*I,* 294 F.3d at 94 (same). Of course, in the absence of any communication to third-parties, it is difficult to image how the defendant could "accomplish the sort of third-party compulsion described in the convention." 326 F.3d at 234. It does not appear that Syria alleges such a total failure of communication. Nevertheless, because the court must be satisfied regarding "its authority to hear the case," *Foremost–McKesson,* 905 F.2d at 449 (quotations omitted), the parties may elect to pursue this matter in jurisdictional discovery.

4. Because the plaintiffs have voluntarily withdrawn their claims against the Syrian Ministry of Defense, Mustafa Tlass, and Ghazi Kanaan, the defendant's argument regarding the plaintiffs' failure to serve those individuals, Def.'s Mot at 5–7, is moot.

§§ 402(2)-(3), 403, 423). This court sees no reason to depart from the analysis in *Flatow*. Accordingly, assuming *arguendo* that the defendant may raise principles of international law as a defense to personal jurisdiction, the court determines that it can maintain jurisdiction over Syria consistent with the principles of international law governing extraterritorial jurisdiction. *Id.*

## C. The Plaintiffs State a Claim On Which Relief Can Be Granted

### 1. Legal Standard for Rule 12(b)(6) Motion to Dismiss

■ A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C.Cir.2002). The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C.Cir. 2003) (citing FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47–48, 78 S.Ct. 99 (internal quotation marks omitted). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), or "plead law or match facts to every element of a legal theory." *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C.Cir.2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C.Cir.2004); *Kingman Park*, 348 F.3d at 1040. Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual · allegations—including mixed questions of law and fact—as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C.Cir.2003); *Holy Land Found. for Relief & Development v. Ashcroft*, 333 F.3d 156, 165 (D.C.Cir.2003); *Browning*, 292 F.3d at 242. While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

### 2. The Plaintiffs State Valid Claims

The plaintiffs list a variety of tort theories on which they seek to recover from the defendants. Compl. ¶¶ 37–60 (specifying causes of action for false imprisonment, civil conspiracy and aiding and abetting, intentional and/or negligent infliction of emotional distress, assault, battery, loss of consortium and solatium, and economic damages). Syria argues, quite accurately, that the plaintiffs "allege no source, statutory or otherwise," on which to base a cause of action for the above claims. Def.'s Mot. at 17. Syria further argues that such omission merits dismissal pursuant to Rule 12(b)(6). *Id.* But Syria places a greater burden on the plaintiffs than notice pleading requires. *Swierkiewicz*, 534 U.S. at 511–14, 122 S.Ct. 992; *Krieger,*

211 F.3d at 136.[5] Accordingly, the court denies Syria's motion to dismiss for failure to state a claim.

### D. The Court Grants the Plaintiffs Leave to Amend Their Complaint

Although the court denies Syria's motion to dismiss for failure to state a claim, the court believes that this litigation will proceed most efficaciously if the parties establish which law will apply. In their opposition to Syria's motion to dismiss, the plaintiffs appear to lean strongly in favor of application of District of Columbia tort law, Pls.' Opp'n at 20, a choice which this court favors as well, *see, e.g., Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 14–15 (D.D.C.1998) (noting the "administrative difficulties associated with interpreting ... unfamiliar foreign law" and the fact that "the United States has a much stronger interest than [the foreign entity] in adjudicating [an] action arising from a United States citizen's [injury]").[6] Nevertheless, Syria argues that "[t]he law to be applied will most likely be the law of Turkey." Reply at 8.

To resolve this dispute, the court directs the plaintiffs to amend their complaint with a statement of which law they seek to apply. Aside from inserting the relevant law and making any changes to reflect the dismissed defendants, the plaintiffs may not otherwise modify the complaint. Syria may then determine whether to bring another Rule 12(b)(6) motion. Such motion may only challenge the sources of law on which the plaintiffs base their complaint and should take into account the arguments the plaintiffs raise in their opposition to the section of the defendant's current motion to dismiss regarding application of D.C. law. *See* Pls.' Opp'n at 16–23 (arguing, *inter alia,* that the United States has a stronger interest than the foreign fora, that administrative difficulties would arise in the application of foreign law, that Congress sought for federal courts to create coherent national standards in actions under § 1605(a)(7)).

### IV. CONCLUSION

For all the foregoing reasons, the court denies Syria's motion to dismiss on personal jurisdiction grounds; denies without prejudice Syria's motion to dismiss on subject matter jurisdiction grounds; orders the parties to submit within 45 days of the issuance of this opinion a joint plan for conducting discovery on the issue of whether Syria provided material support

---

**5.** The court does not read *Acree v. Iraq,* 370 F.3d 41 (D.C.Cir.2004), to have modified the threshold for surviving a Rule 12(b)(6) motion to dismiss. In *Acree,* the D.C. Circuit *sua sponte* dismissed a complaint where the plaintiffs, like the plaintiffs in this case, relied on "generic" common law torts but did not specify "any other specific source in state, federal, or foreign law for their cause of action." *Id.* at 59. The D.C. Circuit ordered the parties "to consider this issue in preparation for oral argument," but it would seem that the parties showed up at court without doing their homework. *Id.* (noting that "[w]hen pressed repeatedly at oral argument, appellees offered no coherent alternative"). Thus, as the court stated, "[a]t oral argument, counsel for appellees gestured again toward generic common law torts, but generic com-

mon law cannot be the source of a federal cause of action." *Id.* Under those circumstances, and at a juncture in the litigation where the plaintiffs had obtained a "nearly-billion dollar default judgment against a foreign government whose present and future stability has become a central preoccupation of the United States' foreign policy," the court found that "exceptional circumstances" justified dismissal for failure to state a claim. *Id.* at 58–59.

**6.** Although *Acree* rejected *Flatow's* reliance on "generic" formulations of tort law, 370 F.3d at 59, the statement in *Flatow* of the policy considerations behind imposing a uniform law in § 1605(a)(7) cases remains valid.

and resources to the PKK; denies without prejudice Syria's motion to dismiss for failure to state a claim; and grants the plaintiffs leave to amend their complaint with a more specific statement of the law on which they will base their causes of action. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 3rd day of March, 2005.